# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

REGINA SILVAS,

        Plaintiff,

  vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

_____/

Case No. 09-cv-00030-JLT

DECISION AND ORDER REGARDING
SOCIAL SECURITY COMPLAINT
(Doc. 1)

ORDER DIRECTING REMAND PURSUANT TO
42 U.S.C. § 405(g)

ORDER DIRECTING THE CLERK TO ENTER
JUDGMENT FOR PLAINTIFF, REGINA SILVAS,
AGAINST DEFENDANT MICHAEL J. ASTRUE

## **BACKGROUND**

Plaintiff Regina Silvas ("Plaintiff") seeks judicial review of an administrative decision denying her claim for disability insurance benefits ("DIB") under Title II and supplemental security income benefits ("SSI") under Title XVI of the Social Security Act (the "Act"). Pending before the Court is Plaintiff's appeal of the Agency's decision denying her application for benefits. Plaintiff filed a complaint on January 7, 2009. (Doc. 1). On August 6, 2009, Plaintiff filed her Opening Brief. (Doc. 15). Defendant filed an Opposition Brief on September 9, 2009. (Doc. 16). Plaintiff filed a Reply Brief on September 22, 2009. (Doc. 17).

1

# FACTS AND PRIOR PROCEEDINGS[1]

On August 29, 2003, Plaintiff filed an application for SSI benefits under Title XVI of the Act. AR at 338-41.  On September 23, 2003, Plaintiff filed a DIB application under Title II of the Act.  Id. at 84-87.  In her SSI application,  Plaintiff alleged that she had been under a disability since March 31, 2002, due to disabling problems including asthma, stress disorder, and neck and back pain.  Id. at 338.  In her DIB application, Plaintiff alleged a disability onset date of March 31, 2003.  Id. at 84. After the Agency denied her request for benefits. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  Id. at 344-53.  On July 19, 2006, the ALJ issued a decision denying benefits.  Id.  Specifically, the ALJ found that Plaintiff was not disabled within the meaning of the Act.  Id. at 353.  However, on March 30, 2007, the Appeals Council remanded the case back to the ALJ for further proceedings to obtain updated treatment records regarding Plaintiff's carpal tunnel syndrome, give further consideration to Plaintiff's residual function capacity ("RFC") and obtain evidence from a vocational expert.  See id. at 354-57.

Following remand, a new hearing was held before a different ALJ.  AR at 465-88.  On May 30, 2008, the ALJ issued a new decision again denying Plaintiff's application for benefits.  Id. at 11-19.  The Appeals Council affirmed this decision.  Id. at 7-10.

Hearing Testimony

At the May 14, 2008 hearing, Plaintiff testified she was born on July 4, 1961 (age 48 at the time of the hearing).  AR at 469.  She stated she completed 12th grade.  Id.

Plaintiff testified that she last worked between November 1999 and May 2001 doing secretarial/accounting work.  AR at 469.  Before that job, she stated that she worked for approximately three years as a warranty clerk at a new car dealership.  Id. at 470.  From 1992-1993, Plaintiff recounted working as a bookkeeper at a trucking company.  Id.  From 1991, she stated she worked as a bookkeeper at a air conditioning and heating firm.  Id.  In essence, she recounted performing the same kind of bookkeeping/secretarial work in all her prior jobs.  Id.  She stated that these jobs involved tasks like answering phones, taking and documenting payments that were made,

---

[1]  References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

and filing.  Id.  She noted that these jobs involved lifting files as well.  Id.  She stated she used computers, typed and did some writing in these jobs.  Id. at 471.

Plaintiff stated she had not worked since 2001 because she had carpal tunnel syndrome which prevented her from using her hands.  AR at 471.  She recounted having surgery on both hands approximately four to five years prior to her hearing testimony.  Id.  She believed that the surgery was not successful.  Id. at 472.  She recounted that she still had problems with her hands.  For instance, she stated she had difficulty picking up small objects like coins, had cramps and had to have assistance from her daughter to tie her shoelaces.  Id.  She estimated that without help she needed 30 minutes to tie her laces herself.  Id.  She testified she could use a fork and knife.  Id.

Plaintiff also described neck and back pain that shoots up to her neck in pulses and down to her ankles.  AR at 478.  She testified she had pain in both legs.  Id.  Plaintiff estimated she could lift two to five pounds with her hands.  AR at 473.  She stated that weights greater than this caused her neck to hurt.  Id.  Plaintiff also described difficulty gripping and manipulating buttons.  Id.  She reported she that these problems began about two years prior to the hearing.  Id.

Plaintiff testified she had difficulty washing her hair because it required her to hold her arms above her shoulders.  AR at 474.  She estimated she could stand about five to ten minutes at a time.  Id. at 478.  She believed she could sit for about 30 minutes at one time but felt that she would need to shift her weight every five to ten minutes.  Id.  She stated she could walk about two blocks before she needed to rest.  Id.  She estimated that during an eight-hour time period she needed a break of about 10-15 minutes duration every 30 minutes.  Id. at 479.  She described having two or three bad days each week in which her physical problems were greater.  Id.  She stated that she spent most of her day sitting and thinking.  Id. at 477.  She testified she helped around the house but she didn't fix meals or wash clothes.  Id.

Plaintiff stated that she was always depressed and angry.  AR at 474.  She reported she cried a lot and had no desire to do anything.  Id.  She estimated that she stayed in bed clothes all day for five out of seven days each week.  Id.

Plaintiff testified she had trouble concentrating and "spaced" out a lot.  AR at 475.  She described having trouble getting along with others, and reported that most of her neighbors think she

1   is mean because she yelled at them and got mad if people got in her way.  Id. at 476.  She stated that

2   her daughter was reluctant to take her to places like Wal-Mart because of this.  Id.  She reported she

3   had a drivers licence but hadn't driven in the last year-and-a-half because she would forget where she

4   was going.  Id. at 480.

5       A vocational expert ("VE"), Judith Najarian, testified at the May 14, 2008 hearing as well.

6   She characterized Plaintiff's past work as akin to account clerk/bookkeeper for purposes of the

7   Dictionary of Occupational Titles ("DOT").  AR at 481.  She described the work as sedentary and

8   skilled or semi-skilled, although she noted that in one position Plaintiff described lifting boxes

9   weighing as much as 30-40 pounds and characterized this as medium level work.[2]  Id.

10      The ALJ posed three hypotheticals to the VE.  In the first, he described a person of Plaintiff's

11  age, education and work experience who could lift 20 pounds occasionally, ten pounds frequently,

12  could walk/stand for six hours in an eight-hour day, sit for six hours in an eight-hour day,

13  occasionally climb ladders, ropes and scaffolds, occasionally grasp and twist forcefully with the

14  hands, lightly grasp and handle frequently, understand, remember and carry out simple repetitive

15  tasks, and was restricted to limited contact with the public.  AR at 482-83.  The VE opined that such

16  a person couldn't perform Plaintiff's past relevant work but could perform other work in the state

17  and national economy including the jobs of information clerk, photocopy clerk and mail clerk or mail

18  sorter.  Id. at 483-84.

19      The ALJ then described a hypothetical further limiting the person to occasionally handling,

20  fingering and grasping.  AR at 484-85.  The VE stated that such a person could not work.  Id. at 485.

21      In a third hypothetical, the ALJ asked the VE to evaluate a person of Plaintiff's age,

22  education and work experience who could not lift and carry even five pounds, and could stand and

23  walk less than two hours in an eight-hour day.  AR at 485.  The VE opined that a person with these

24  restrictions could not perform any work.  Id.

25  ///

26

27      [2]  In her testimony at the May 14, 2008 hearing following remand from the Appeals Council, Plaintiff described
    lifting boxes in her previous work but didn't state how much they weighed.  See AR at 470.  However, at the first hearing
28  on May 9, 2006, she estimated she may have lifted boxes weighing ten to 20 pounds.  Id. at 442.

1          <u>Relevant Medical Testimony</u>

2          Records of x-rays of Plaintiff's spine taken in May and July 2003, revealed decreased

3    intervertebral disc space at C6-7 with mild osteoarthritic change of the cervical spine.  AR at 200-01.

4          Notes of examinations by a Dr. Abordo, Ph.D. between March and August 2003, at the

5    Sequoia Family Medical Center in Porterville, California, recounted Plaintiff as suffering from

6    severe anxiety, stress and depression.  <u>See</u> AR at 220-29.

7          In October 2003, Dr. Boota Chahil, a neurologist examined Plaintiff on referral.  Following

8    testing, Dr. Chahil diagnosed Plaintiff with carpal tunnel syndrome, severe on the left side and

9    moderate on the right.  AR at 192.

10         In December 2003, Dr. Thomas Maclennan interpreted an MRI of Plaintiff's cervical spine as

11   indicative of mild stenosis at C4-5.  AR at 190-91.  Likewise, an MRI in January 2004, indicated

12   mild spondylosis of the thoracic spine.  <u>Id</u>. at 166.

13         Dr. Srivastava Pramod examined Plaintiff in March 2004, at which time Dr. Pramod noted

14   that Plaintiff complained of a history of numbness, burning and tingling in the outer four digits of her

15   left hand.  AR at 164.  He interpreted a nerve conduction study as indicative of severe carpal tunnel

16   syndrome in Plaintiff's left hand and noted she was unable to make a fist or grip and advised surgical

17   intervention.  <u>Id</u>.

18         In April 2004, Dr. Archimedes Garcia, a non-examining state agency physician, filed a

19   Mental Functional Capacity Assessment of Plaintiff based upon his review of Plaintiff's medical

20   records.  He noted Plaintiff suffered from severe anxiety and depression, was a victim of sexual

21   abuse from her father as a child, got irritated easily with people (including yelling and cursing) and

22   diagnosed Plaintiff as suffering from schizophrenia, psychosis, post-traumatic stress disorder

23   ("PTSD") and personality disorder.  AR at 231, 233, 234, 238, 246.  Nevertheless he determined

24   Plaintiff had no restrictions with respect to daily living and activities or in her ability to maintain

25   concentration, persistence and pace, and found only mild restrictions in social functioning.  <u>Id</u>. at

26   241.  Dr. Garcia further opined that Plaintiff could perform simple repetitive tasks, could sustain

27   concentration and persistence in two hour increments, could get along with coworkers and

28   supervisors with normal supervision but should be limited in contact with the public.  <u>Id</u>. at 247-49.

1    He also believed Plaintiff could adapt to normal work place changes.  Id. at 249.

2        Also in April 2004, Dr. Brian Ginsburg, another non-examining state agency consultant, filed

3    a Physical RFC Assessment of Plaintiff based on his review of her medical records.  He noted "some

4    abnormal findings" in the lumbar spine and "mild" stenosis in the cervical spine at C4-5 and also

5    noted findings of severe carpal tunnel syndrome in Plaintiff's left hand.  AR at 259-60.  He opined

6    that Plaintiff could lift 20 pounds occasionally, ten pounds frequently, could stand/walk six hours in

7    an eight hour day, sit six hours in an eight hour day, was unlimited in her ability to push/pull but

8    noted manipulative limitations to forceful or frequent gripping, grasping or squeezing with the left

9    upper extremity. Id. at 252-254.

10       In June 2004, Dr. Carl Boatwright interpreted an x-ray of Plaintiff's right shoulder as

11   "unremarkable."  AR at 208.  In July 2004, Dr. Pramod performed carpal tunnel release surgery on

12   Plaintiff's right wrist/hand.  AR at 331.  He noted that Plaintiff tolerated the procedure well and

13   described her prognosis as "good."  Id.

14       Also in late July 2004, Plaintiff was examined by Dr. Vinay Buttan.  Dr. Buttan noted

15   Plaintiff had right carpal tunnel release surgery just three weeks prior to the examination and a left

16   carpal tunnel release three months before that.  AR at 261.  Dr. Buttan examined Plaintiff and

17   documented high blood pressure (140/100), a normal gait, no muscular atrophy, no redness or

18   swelling in the joints, surgical scars from Plaintiff's recent carpal tunnel surgeries, tenderness in both

19   surgical sites, and tenderness in Plaintiff's shoulders, cervical spine and lumbosacral spine.  Id.  At

20   the time, Plaintiff complained of severe lower back pain also.  Id.

21       Based on his tests and observations, Dr. Buttan diagnosed degenerative osteoarthritis of

22   Plaintiff's cervical spine with mild stenosis and degenerative osteoarthritis of her lumbosacral spine

23   with disc disease.  AR at 262.  He also noted hypertension, bronchial asthma, anxiety and depression,

24   and bilateral carpal tunnel syndrome.  Id.  He commented that Plaintiff's high blood pressure was not

25   well-controlled, that her asthma was well-controlled and found her "main problem" to be pain in her

26   lower back and neck, which he believed was secondary to her arthritis, stenosis and disc disease.  Id.

27       Dr. Buttan believed, at that time, that Plaintiff could sit four to five hours with normal breaks,

28   stand four to five hours with normal breaks, and walk three to four hours with normal breaks.  AR at

262.  He did not believe she could perform repetitive bending, squatting, or climbing and did not

believe she could lift more than 10-15 pounds because of her back and neck pain.  Id. at 262-63.  He

also voiced concerns about her ability to do manipulative work with computer and typewriter

keyboards due to her bilateral carpal tunnel impairment although he noted that she was still

recovering from her surgeries.  Id. at 262, 263.

In August 2004, Plaintiff was examined by a psychiatrist, Dr. Michael Barnett.  He

characterized Plaintiff's main complaint as being unable to talk to people anymore.  AR at 264.  Dr.

Barnett described Plaintiff as obese, tearful and seemingly older than her actual age but he noted no

psychic distress.  Id.  He recounted her descriptions of sexual abuse by her father between the ages of

8 and 12, physical abusive by one ex-husband and verbal abuse by another.  Id.  He that Plaintiff had

a history of substance abuse that included an arrest for being under the influence.  Id.  Dr. Barnett

noted no current suicidal ideation and characterized Plaintiff's mood as depressed with "mild"

psychotic symptoms.  Id.

Dr. Barnett performed a mental status examination involving a series of mental tests of

Plaintiff.  AR at 265.  He diagnosed methamphetamine abuse in remission, personality disorder, high

blood pressure, elevated cholesterol, asthma and pain in her neck and back.  Id.  He described her

"major" problem as PTSD with "minor" psychotic symptoms secondary to the PTSD.  Id. at 266.

He believed she had not received adequate treatment for her problems and stated that if she did get

adequate treatment she could probably return to work.  Id.  At the present, however, he believed her

depressive symptoms made full-time work difficult.  Id.  Dr. Barnett noted at that time, that Plaintiff

could not focus attention and concentration to complete routine work tasks and would need special

attention and supervision.  Id.  He also believed she would have difficulty adapting to changes at

work.  Id.  He described her prognosis as "poor" given her history of inadequate treatment and

believed her history of methamphetamine abuse and her personality disorder, in particular, negatively

impacted her prognosis.  Id.

In September 2004, Dr. James Glazer, another non-examining state agency consultant, filed a

Physical RFC Assessment based on his review of Plaintiff's records.  He concluded that, despite her

maladies including neck and lower back pain from spinal arthritis and disc disease, bilateral carpal

1  tunnel syndrome, depression, PTSD and anxiety, Plaintiff was capable of lifting 20 pounds

2  occasionally and ten pounds frequently, standing/walking for six hours in an eight hour day, sitting

3  for six hours in an eight hour day, climbing and stooping occasionally and kneeling, crouching and

4  crawling frequently.  AR at 290-92.  He believed her manipulative abilities (handling) were limited

5  and that she was limited to occasional forceful grasping because of her bilateral carpal tunnel

6  syndrome.  Id.  He concluded by finding that Plaintiff was limited to light work with postural and

7  manipulative limitations including tasks requiring her to lift her extremities above her shoulders.  Id.

8  In November 2004, non-examining physician Dr. Middleton, filed a Mental RFC

9  Assessment.  After reviewing Plaintiff's records he concurred in the diagnoses of personality

10  disorder with psychosis, schizophrenia, anxiety and PTSD.  AR at 277, 280.  Also, he described

11  Plaintiff as possessing maladaptive and inflexible personality traits.  Id. at 282.  He opined that

12  Plaintiff retained the ability to understand simple instructions, could concentrate for less than one

13  hour at a time, and she was able to relate minimally but that she was unable to adapt to changing

14  conditions.  Id. at 270.  In addition, Dr. Middleton characterized Plaintiff as moderately limited in

15  her ability to understand and remember short and simple instructions, maintain attention and

16  concentration, perform activities within a schedule and engage in regular attendance. Id. at 268-69.

17  Also, he found that she was moderately limited in her ability to interact with the public and get along

18  with coworkers and behave in an appropriate manner.  Id. at 269.

19  Following remand of the ALJ's first decision by the Appeals Council in 2007, additional

20  medical evidence was produced.  The records reveal that in April 2007, Plaintiff was examined by

21  Dr. Nauman Qureshi.  Dr. Qureshi noted Plaintiff's complaints of lower back and neck pain.  AR at

22  392.  His examination revealed muscle spasms.  Id.  He assessed Plaintiff with low back and cervical

23  spine pain, anxiety and depression, COPD, gastroreflux disease, nicotine addiction and obesity.  Id.

24  He recommended medications for treatment including Vicodin and Prozac.  Id.

25  In December 2007, Plaintiff was examined by Dr. Juliane Tran.  She recorded Plaintiff as

26  stating she could cook, do dishes with some difficulty (often breaks them) but not doing any

27  mopping or vacuuming.  AR at 410.  Plaintiff told Dr. Tran that she shopped for groceries with

28  difficulty and also that she had no hobbies.  Id. at 411.  Dr. Tran noted Plaintiff currently took

1   numerous medications, including Vicodin and Prozac, as well as blood pressure medication.  Id.

2        Dr. Tran performed a physical examination.  During the examination she noted that Plaintiff

3   appeared anxious but had a normal gait, sat comfortably, was able to get on and off the table and don

4   and doff her shoes.  AR at 411.  She noted that Plaintiff had a low pain threshold with frequent

5   wincing during range of motion testing.  Id.  Dr. Tran performed several tests including: reflexes,

6   sensory and palpation exams, coordination testing and range of motion testing.  Id. at 412.  She noted

7   that Plaintiff used no ambulatory device.  Id.  She calculated Plaintiff's motor strength as 5/5.  Id.

8        Dr. Tran concluded that Plaintiff's neck and back pain probably resulted from cervical and

9   lumbar degenerative disc disease or strain.  AR at 413.  However, she found no evidence of cervical

10   or lumbar radiculopathy.  Id.  Although noting Plaintiff's complaints of pain regarding carpal tunnel

11   syndrome, Phalen's and Tinel's tests were negative.  Id.  Dr. Tran noted some decrease in Plaintiff's

12   fourth finger on both her right and left hands but determined this was not consistent with carpal

13   tunnel syndrome.  Id.  Dr. Tran concluded that Plaintiff had no functional limitations.  Id.

14        Also in December 2007, Plaintiff was examined by a psychologist, Dr. Mary McDonald,

15   Ph.D.  Dr. McDonald recounted that Plaintiff told her she couldn't work, that people made her angry

16   and she hated being around them.  AR at 399.  Plaintiff also told her that she was depressed and had

17   problems with rage and that she had been arrested about 7 or 8 years earlier for being under the

18   influence of methamphetamine.  Id. at 400.

19        Dr. McDonald performed a mental status examination of Plaintiff.  She recorded that Plaintiff

20   correctly identified the President, she had excellent attention, unimpaired memory and behaved

21   appropriately but seemed depressed with irritability.  AR at 401-02.  Dr. McDonald described

22   Plaintiff's thought processes as clear.  Id. at 402.  Plaintiff told her she attempted suicide about 7 or 8

23   years before but had no such thoughts at present.  Id.  Dr. McDonald described Plaintiff's speech as

24   clear and coherent but terse and described her mood as slightly argumentative, depressed and

25   irritable.  Id.  She assessed a Global Assessment of Functioning ("GAF") score of 55.[3]  Id. at 403.

26

27       [3]  A GAF score of 55 falls into a category described as: Moderate Symptoms (e.g. flat affect and circumstantial

28   speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. no friends, conflicts with peers or co-workers).  See American Psychiatric Association, Diagnostic and Statistical Manual of Mental

1    Dr. McDonald described Plaintiff as "moderately depressed" and believed it was caused by

2    her carpal tunnel syndrome in both wrists and hands.  AR at 402.  She believed that Plaintiff's

3    physical difficulties augmented her depression.  Id.  Plaintiff told her she had not obtained treatment

4    for her depressions due to a lack of availability.  Id.  Dr. McDonald also noted "moderate"

5    psychosocial stressors flowing from Plaintiff's divorces, unemployment and financial difficulties.

6    Id. at 403.  She described Plaintiff's prognosis as "questionable."  Id.

7    Dr. McDonald concluded by stating her belief that Plaintiff would respond "much better to

8    treatment with medication and therapy."  AR at 403.  She opined also that, although Plaintiff was

9    depressed, it did not render her unable to understand instructions.  Id.  However, she believed

10   Plaintiff would have significant difficulty working due to her current level of depression.  Id.

11   <u>ALJ Findings</u>

12   <u>2006 Decision</u>

13   The ALJ first issued a decision in this matter on July 19, 2006.  AR at 344-53.  Although

14   Plaintiff testified, no VE was called to testify.  The ALJ evaluated Plaintiff pursuant to the customary

15   five-step sequential evaluation.  In this five-step process, the ALJ determined first that Plaintiff had

16   not engaged in substantial gainful activity since her claimed onset date of March 31, 2003.   AR at

17   348.  Second, he found that Plaintiff had severe impairments consisting of: degenerative disc disease

18   of the cervical spine; degenerative disc disease and degenerative arthritis of the lumbar spine; history

19   of bilateral carpal tunnel syndrome, status post bilateral carpal tunnel release; depression; and

20   anxiety.  Id.  However, in the third step of his evaluation, the ALJ determined that these

21   impairments, or a combination of these impairments, did not meet or exceed the level required under

22   Agency guidelines for presumed disability.  Id.at 349.

23   In the fourth step of his analysis, the ALJ determined that Plaintiff had the residual functional

24   capacity ("RFC")  to lift 20 pounds occasionally, ten pounds frequently, to stand and/or walk six

25   hours in a workday, to sit six hours in a workday, to occasionally climb ladders, ropes, or scaffolds,

26   was limited to occasional forceful grasping or twisting with both hand, and was limited to simple

27

28   <u>Impairments</u>, 4th text revision, 2000, p. 34 ("DSM-IV).

1  repetitive tasks that involve occasional interaction with the public.  AR at 349.  Based on his RFC

2  finding and the record, the ALJ concluded that Plaintiff retained the ability to perform her past

3  relevant work as a bookkeeper (Step 4).[4]  Id. at 352.  As a result, he determined that Plaintiff was not

4  disabled under the Act.  Id. at 353.

5      Appeals Council Remand

6      On March 30, 2007, the Appeals Council reviewed the ALJ's decision and ordered the matter

7  remanded for further consideration.  AR at 354-57.  The Appeals Council noted that Plaintiff's past

8  relevant work as a bookkeeper under the Dictionary of Occupational Titles ("DOT") required

9  "frequent handling and fingering" which appeared inconsistent with the ALJ's "limitations to simple

10  repetitive tasks and may be inconsistent with the claimant's manipulative abilities."  Id. at 355.  The

11  Appeals Council also determined that VE testimony, which was not presented at the first hearing,

12  was necessary.  Id.  Finally, the Appeals Council determined that an update of the medical records

13  concerning Plaintiff's carpal tunnel syndrome was desirable.  Id. at 356.

14      2008 Decision

15      Following a hearing in which both Plaintiff and a VE testified, the ALJ issued a new decision

16  on May 30, 2008.  AR at 11-19.  Again, the ALJ evaluated Plaintiff pursuant to the customary five-

17  part sequential evaluation.  He reiterated that Plaintiff had not engaged in substantial gainful activity

18  since March 31, 2003 (Step 1).  Id. at 16.  He reiterated that Plaintiff suffered from the following

19  "severe" impairments:  degenerative disc disease of the cervical spine; degenerative disc disease and

20  degenerative arthritis of the lumbar spine; history of bilateral carpal tunnel syndrome, status post

21  bilateral carpal tunnel release; depression; and anxiety (Step 2).  Id.  He determined at Step 3 in the

22  analysis that these impairments, or a combination of these impairments, did not meet or exceed the

23  level required under Agency guidelines for presumed disability.  Id.

24      In the fourth step of his analysis, the ALJ determined that Plaintiff had the RFC to perform

25  light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that she could only

26  occasionally climb ladders, ropes and scaffolds, could only occasionally grasp forcefully or twist

27

28      [4]  As noted, no VE testified at this hearing and the ALJ made no alternative finding regarding Plaintiff's ability
to perform other work in the economy (Step 5).

1   forcefully with either hand, could understand, remember and carry out simple repetitive tasks, and

2   could tolerate only limited contact with the general public.  AR at 17.  Based on the RFC finding and

3   citing the testimony of the VE, the ALJ concluded that Plaintiff was precluded from performing her

4   past relevant work as a bookkeeper (Step 4).  Id. at 17-18.  However, the ALJ concluded that

5   Plaintiff retained the RFC to perform other work in the economy (Step 5).  Id. at 18.  As a result, the

6   ALJ determined that Plaintiff was not disabled as defined by the Act.[5]  Id. at 18-19.  The Appeals

7   Council affirmed this decision on November 13, 2008.  Id. at 7-10.

8                                      **SCOPE OF REVIEW**

9          Congress has provided a limited scope of judicial review of the Commissioner's decision to

10  deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the

11  Court must determine whether the decision of the Commissioner is supported by substantial

12  evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla," Richardson

13  v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance.  Sorenson v. Weinberger, 514

14  F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might

15  accept as adequate to support a conclusion."  Richardson, 402 U.S. at 401.  The record as a whole

16  must be considered, weighing both the evidence that supports and the evidence that detracts from the

17  Commissioner's conclusion.  Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the

18  evidence and making findings, the Commissioner must apply the proper legal standards.  E.g.,

19  Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the

20  Commissioner's determination that the claimant is not disabled if the Secretary applied the proper

21  legal standards, and if the Commissioner's findings are supported by substantial evidence.  See

22  Sanchez v. Sec'y of Health and Human Serv., 812 F.2d 509, 510 (9th Cir. 1987).

23                                         **REVIEW**

24  _____

25  [5]  In the 2008 decision following remand from the Appeals Council, the ALJ adopted the findings and rationale
    made by the ALJ in the 2006 decision to the extent they were not inconsistent with his decision.  AR at 14.  In that

26  previous decision, the ALJ specifically determined that Plaintiff retained the ability to lift and carry 20 pounds
    occasionally and ten pounds frequently, to stand/walk six hours in a workday and to sit for six hours in a work day.  Id. at

27  349.  These provisions are consistent with the ALJ's finding in the 2008 decision that Plaintiff retained the RFC to
    perform light work and are necessary requirements for such work under the Agency regulations.  See 20 C.F.R. s
    404.1567(b); 20 C.F.R. 416.967(b).  Thus, although the ALJ did not reiterate the exertional limitations outlined in the

28  2006 decision, the Court concludes that the ALJ effectively incorporated them into his new RFC assessment.

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden is on the claimant to establish disability.  Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, *inter alia*, a five-step sequential disability evaluation process.  20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[6]  As noted, applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of her disability; (2) had a medically determinable and severe physical impairment (degenerative disc disease and degenerative arthritis of the cervical spine and degenerative arthritis of the lumbar spine, history of bilateral carpal tunnel syndrome, status post bilateral carpal tunnel release, depression and anxiety); (3) did not have an impairment which meets or is equal to one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) could not perform her past work as a bookkeeper; but (5) retained the RFC to perform other work related activities.  AR at 16-18.  The ALJ then determined that Plaintiff was not disabled as defined in the Act.  Id. at 18-19.

Plaintiff challenges the ALJ's determination at Step 5 of the sequential evaluation process, where an individual's ability to perform other work is assessed based on her RFC.  In particular, she alleges that the ALJ: (1) erred in the hypothetical he presented to the VE and relied upon in adopting Plaintiff's RFC to perform other work; (2) erred in discounting the opinions of examining experts Drs. Buttan, Barnett, and McDonald, as well as a non-examining consultant, Dr. Middleton; and (3) improperly discounted Plaintiff's testimony regarding her symptoms and capabilities.  (See Doc. 15 at 10-11, 11-18).

---

[6] All references are to the 2000 version of the Code of Federal Regulations unless otherwise noted.

**DISCUSSION**

A.  The ALJ did not Err in the Hypotheticals Put to the VE

In both the 2008 and 2006 decisions, the ALJ determined, in assessing Plaintiff's mental impairments, that she had "moderate difficulties in maintaining concentration, persistence and pace." AR at 17, 349.  At the administrative hearing held on May 14, 2008, the ALJ presented a hypothetical to the VE of a person of Plaintiff's age, education and work experience, who could lift 20 pounds occasionally, ten pounds frequently, stand/walk a total of six hours in an eight hour workday, sit for six hours in an eight hour workday, occasionally climb ladders, ropes or scaffolds, occasionally grasp or twist forcefully with the hands, understand, remember and carry out simple repetitive tasks, and who was restricted to only limited contact with the general public.  AR at 482. The ALJ further clarified that such a person could engage in light grasping or handling on a frequent basis.  Id. at 483.  The VE opined that while such a person could not perform Plaintiff's past work as a bookkeeper, such a person could perform other work like information clerk, photocopy clerk or mail clerk/mail sorter.  Id. at 483-84.  This RFC and the conclusions of the VE in regard to it were adopted by the ALJ in concluding that Plaintiff retained the ability to perform other work and was not disabled.  See id. at 17, 18.

Plaintiff contends that the ALJ erred in relying on the VE's opinion because he failed to specifically incorporate his findings that Plaintiff had moderate limitations to maintaining concentration, persistence and pace resulting from Plaintiff's mental impairments in his hypothetical. See Bray v. Commissioner of Social Security, 554 F.3d 1219, 1228 (9th Cir. 2009) (noting that if an ALJ's hypothetical does not reflect all of a claimant's limitations then an expert's testimony has no evidentiary support to a finding that the claimant is capable of performing other work in the economy).  Although not expressly identified by Plaintiff or the ALJ, the reference to "moderate" limitations concerning concentration, persistence and pace tracks a Mental RFC Assessment filed by a non-examining specialist, Dr. Middleton.  AR at 285.

In Stubbs-Danielson v. Astrue, 539 F.3d 1169 (9th Cir. 2008), the Ninth Circuit held that an RFC finding that a claimant was limited to simple, routine and repetitive work was sufficient despite that it did not expressly incorporate conclusions by doctors that the claimant was "moderately

limited" in her ability "to perform at a consistent pace without an unreasonable number and length of rest periods." Here, despite his findings of moderate limitations, Dr. Middleton determined that Plaintiff was capable of understanding simple instructions. See AR at 270. In addition, in a Mental RFC Assessment filed by Dr. Garcia, he specifically opined that Plaintiff retained the ability to perform simple, repetitive tasks. Id. at 249. Under these circumstances, where the ALJ posited to the VE in his hypothetical and incorporated in his RFC a restriction to simple, repetitive tasks, the failure to specifically mention Plaintiff's moderate limitations with respect to maintaining concentration, persistence and pace was not error. See Stubbs-Danielson, 539 F.3d at 1173-74.

### B. Discounting of the Opinions of Experts

### 1. The ALJ Improperly Rejected the Opinion of Dr. Buttan Concerning Manipulative Limits

The ALJ's RFC finding makes no allowance for manipulative limitations except for "forceful" grasping and twisting of the hands. AR at 18. In fact, in the hypothetical put to the VE which formed the basis for his RFC assessment, the ALJ explicitly told the VE that Plaintiff could engage in frequent and continuous light grasping and handling. Id. at 483.

In Dr. Buttan's July 2004 report, he noted that Plaintiff was "still" recovering from recent carpal tunnel release surgery (3 weeks on the right and 3 months on the left). AR at 261. In addition to his other findings, Dr. Buttan wrote that Plaintiff "may not be able to do manipulative works with her hands like manipulating small tools, or work on the keyboard of the computer or typewriter." Id. at 263. Plaintiff asserts that the ALJ's 2008 decision utterly fails to mention Dr. Buttan's findings.[7] (Doc. 15 at 12). She notes that the 2006 decision addresses these findings but argues they do not amount to "legitimate reasons" for discounting his opinion. (Id.)

To reject the uncontroverted opinion of an examining physician, the ALJ must articulate clear and convincing reasons. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). Even if controverted by another doctor, the opinion of an examining physician may be rejected only for specific and legitimate reasons supported by substantial evidence in the record. Id., Edlund v. Massanari, 253

---

[7] In the 2008 decision, the ALJ appears to have confined himself to discussing only new medical evidence developed after remand. See AR at 17. In regards to the previous medical evidence, the ALJ adopted and incorporated the findings made in the 2006 decision. See id. at 14.

1   F.3d 1152, 1158-59 (9th Cir. 2001).

2        The ALJ did not specifically address any of Dr. Buttan's findings in the 2008 decision.  In the

3   2006 decision, the ALJ noted that Dr. Buttan conducted a thorough examination and provided a

4   "detailed report of his findings which are consistent with the record." AR at 351.  However, the ALJ

5   discounted his findings concerning Plaintiff's manipulative abilities as "conjecture," noting Dr.

6   Buttan's use of the phrase "may not be able to do manipulative works," and suggested Dr. Buttan's

7   opinion was unreliable because it was rendered only weeks after carpal tunnel surgery while Plaintiff

8   was still in recovery.  See id.

9        The Court notes that no expert evidence from other sources was cited by the ALJ in either

10  opinion in specifically discounting Dr. Buttan's opinion concerning Plaintiff's manipulative abilities.

11  In the 2008 opinion, the ALJ noted that Dr. Tran found no evidence of carpal tunnel syndrome and

12  no functional limitations of any kind.  See AR at 18, 413.  However, in neither that decision nor in

13  the 2006 decision, did the ALJ cite Dr. Tran's opinion or any other opinion in discussing why Dr.

14  Buttan's opinion was entitled to no weight.  Moreover, other sources, including non-examining

15  consultants Drs. Ginsburg and Glaser, agreed that Plaintiff's carpal tunnel syndrome was pronounced

16  and produced manipulative limitations. See id. at 254, 259-60, 292, 299.  In addition, Dr. Pramod,

17  who performed Plaintiff's surgeries, described Plaintiff's carpal tunnel syndrome as "severe" and

18  noted that it rendered her unable to make a fist or grip.  Id. at 164.

19       Upon review, the Court concludes that the ALJ discounted Dr. Buttan's opinion without

20  providing the required specific and legitimate reasons.  As noted, the ALJ failed to specifically cite

21  or discuss in either decision, the specific evidence that contradicted Dr. Buttan's finding as support

22  for discounting his opinion.  Instead he provided only a cursory conclusion that his opinion was

23  vague and unreliable because it was rendered shortly after Plaintiff's carpal tunnel surgery.  This was

24  error.  See Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) ("The ALJ can meet this burden

25  [of providing specific and legitimate reasons for discounting an examining expert's opinion] by

26  setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his

27  interpretation thereof, and making findings.")

28       The Court notes that the question of Plaintiff's manipulative abilities was an important

portion of the ALJ's RFC finding, in that the VE's conclusion that Plaintiff could work was predicated on a hypothetical which only limited her to occasional "forceful" grasping and twisting and was without restriction in regard to her ability to perform light grasping or handling.  See AR at 482-83.  When the ALJ proposed a scenario wherein Plaintiff was restricted to only occasional handling, fingering and feeling, the VE opined that Plaintiff could perform no work.  Id. at 484-85.  The record may contain specific and legitimate reasons for rejecting Dr. Buttan's opinion on this point but the ALJ did not evaluate and discuss them as basis for discounting the doctor's opinion.

2. The ALJ Improperly Discounted the Opinion of Dr. Barnett and the Non-examining State Agency Consultant

Dr. Barnett, a psychiatrist, examined Plaintiff in August 2004.  He performed a mental status examination and evaluated Plaintiff as suffering from such maladies as PTSD and personality disorder.  AR at 265.  Although he believed that she might be able to return to work if she were properly treated, Dr. Barnett believed that her current depressive symptoms made full-time work difficult.  Dr. Barnett noted that this condition affected her ability to focus attention and concentration, complete routine work tasks, and follow supervision without special attention.  Id. at 266.  He further found that her prognosis was "poor."  Id.

In his 2006 decision, the ALJ rejected Dr. Barnett's opinion that Plaintiff's depressive symptoms rendered her unable to work.  In doing so, he stated simply that this opinion was contradicted by Dr. Barnett's own mental status examination findings and appeared to be influence by Plaintiff's subjective complaints.  AR at 352.

As with Dr. Buttan, the ALJ's rejection of Dr. Barnett's findings was cursory and conclusory.  He provided no specifics beyond mere assertion that Dr. Barnett's opinion was contradicted by his findings.  Further, he failed to support his assertion that Dr. Barnett's findings were "influenced" by Plaintiff's subjective complaints, with any specific bases.  This cursory treatment of the Dr. Buttan's opinion does not rise to the level of either "clear and convincing" or "specific and legitimate" reasons such to justify discounting this medical opinion.  The ALJ fails utterly to explain what specific examination findings made by Dr. Barnett contradicted his conclusions as to Plaintiff's ability to work and he failed to cite specific instances where Plaintiff's subjective complaints were

17

1   adopted by Dr. Barnett without clinical support.  As with the rejection of Dr. Buttan's opinion, the

2   ALJ has not met the requisite standard required for rejection of this examining expert's opinion.

3          Defendant attempts to identify specific grounds for rejecting Dr. Barnett's conclusions,

4   noting inconsistencies in his findings and pointing to specific instances where his conclusions appear

5   to rely solely on Plaintiff's subjective statements.  (See Doc. 16 at 7-8).  The Court agrees that the

6   record may contain such evidence.  However, the Court notes that none of the specific evidence

7   referenced by Defendant was cited or discussed by the ALJ in discounting Dr. Barnett's opinion.

8   This lack of specificity is error.

9          Similarly, the ALJ rejected the opinion of a non-examining consultant, Dr. Middleton, who

10  filed a Mental RFC Assessment finding, inter alia, that Plaintiff's mental impairments rendered her

11  "unable to adapt."  AR at 270.  In rejecting this opinion, the ALJ concluded that Dr. Middleton's

12  opinion was based solely upon Dr. Barnett's evaluation.  Id. at 352.  For the reasons just discussed,

13  rejecting Dr. Middleton's findings on this point simply because it is based upon Dr. Barnett's

14  opinion–without first demonstrating that Dr. Barnett's opinion should be discounted and

15  demonstrating that, in fact, Dr. Middleton's opinion was based only upon Dr. Barnett's opinion--is

16  insufficient.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (noting that the opinion of a

17  nontreating, nonexamining physician can amount to substantial evidence as long as it is supported by

18  other evidence in the record, such as the opinions of other examining and consulting physicians,

19  which are in turn based on independent clinical findings).

20          3. The ALJ Articulated Specific and Legitimate Reasons for Discounting Dr. McDonald's

21          Opinion that Plaintiff's Depression Significantly Hindered Her Ability to Work

22          In December 2007, Plaintiff was given a mental status examination by Dr. McDonald.

23  Following the examination, Dr. McDonald concluded that Plaintiff was "moderately depressed" but

24  "not so depressed that she would be unable to understand instructions."  AR at 402, 403.

25  Nevertheless, Dr. McDonald concluded that her "level of depression" presented "significant

26  difficulties" regarding her ability to work.  AR at 403.  She characterized Plaintiff's prognosis as

27  "questionable."  Id.

28          The ALJ determined that Dr. McDonald's findings were not inconsistent with his RFC when

18

1  he noted Dr. McDonald's statement that Plaintiff "would likely respond well to medication and

2  treatment."  AR at 17.  Also, the ALJ cited Dr. McDonald's assessment of Plaintiff as having a GAF

3  score of 55, which denoted "only moderate symptoms or moderate difficulty in functioning."  Id.

4      Plaintiff argues that the ALJ's characterization of Dr. McDonald's report was misleading and

5  his rejection of her opinion concerning Plaintiff's ability to work was improper.  (Doc. 15 at 17-18).

6      Nevertheless, as noted by the ALJ, a GAF of 55 denotes only "moderate symptoms" and is

7  not per se indicative of disability.  See DSM-IV at 34; see also Howard v. Commissioner of Social

8  Security Administration, 276 F.3d 235, 241 (6th Cir. 2002) (noting that a GAF is not per se necessary

9  in assessing a claimant's RFC.   By contrasting Dr. McDonald's findings that Plaintiff's was

10  "moderately depressed," that she would respond well to treatment via medication and therapy, and

11  that her depression didn't affect her ability to understand instructions, with her conclusion that

12  Plaintiff would have "significant" difficulty working because of her "level of depression," the ALJ

13  articulated "specific, cogent" reasons for discounting Dr. McDonald's opinion.  See Rashad v.

14  Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990); Johnson v. Shalala, 60 F.3d 1428, 1433 (9th Cir. 1995)

15  (contradictions between conclusions and findings support discounting an expert's opinion).  This

16  was further reinforced by the ALJ highlighting the fact that Dr. McDonald appeared to believe that a

17  GAF score of 55 described a person with "serious symptoms" psychological impairment when the

18  definition in the DSM-IV described a person in this range as displaying only "moderate symptoms"

19  of impairment.  See Thomas, 278 F.3d at 957 ("The ALJ need not accept the opinion of any

20  physician, including a treating physician, if that opinion is brief, conclusory, and inadequately

21  supported by clinical findings.")

22      C. Discounting Plaintiff's Symptom Testimony

23      At the 2006 hearing, the ALJ, although noting that Plaintiff's impairments "could reasonably

24  be expected to produce the alleged symptoms," nevertheless found her symptom and pain testimony

25  "not entirely credible."  AR at 350.  To support this determination, the ALJ engaged in an extended

26  discussion of his reasons, including Plaintiff's history of rather conservative treatment, the

27  inconsistency between the severity of her symptoms and the medical evidence and inconsistencies

28  between her testimony and her daily living activities.  See id. at 350-53.  Plaintiff challenges this

19

1  determination, contending that the medical evidence, including the findings of Drs. Buttan, Barnett,

2  and others, support Plaintiff's credibility.  (See Doc. 15 at 18).

3       In light of the Court's conclusion that this matter should be remanded because the ALJ

4  improperly discounted the opinions of certain examining experts, the Court believes any assessment

5  of Plaintiff's credibility at this point is premature and may be cause for reevaluation in conjunction

6  with the Agency's reevaluation of the opinions of Drs. Buttan, Barnett and Middleton.  Therefore,

7  the Court declines to address this issue at this time.

8       For the reasons stated, the Court concludes that the ALJ improperly rejected the opinions of

9  examining physicians Drs. Buttan and Barnett without setting forth clear and convincing reasons for

10  doing so.  Likewise, the Court concludes that the ALJ erred in rejecting the opinion non-examining

11  consultant, Dr. Middleton without proper analysis and factual support.  As a result, the Court

12  concludes that the RFC assessment made by the ALJ is not supported by substantial evidence and, as

13  a result, he erred in finding that Plaintiff was not disabled.

14       The decision whether to remand a matter pursuant to 42 U.S.C. § 405(g) or to order immediate

15  payment of benefits is within the discretion of the district court.  Harman v. Apfel, 211 F.3d 1172,

16  1178 (9th Cir. 2000).  When a court reverses an administrative agency determination, the proper

17  course, except in rare instances, is to remand to the agency for additional investigation or

18  explanation.  Moisa v. Barnhart, 367 F.3d 882, 886 (9th Cir. 2004) (citing INS v. Ventura, 537 U.S.

19  12, 16 (2002)).  Generally, an award of benefits is directed where no useful purpose would be served

20  by further administrative proceedings, or where the record has been fully developed.  Varney v.

21  Secretary of Health and Human Services, 859 F.2d 1396, 1399 (9th Cir. 1988).

22       As discussed above, additional issues remain to be addressed upon remand.  Also, it is not clear

23  that an award of benefits to Plaintiff will result after the additional issues are addressed.  Therefore,

24  the Court will order the matter remanded for further development and consideration of the evidence

25  and for the entry of all necessary and appropriate findings regarding Plaintiff's application for

26  benefits.

27                              **CONCLUSION**

28       Based on the foregoing, this case IS HEREBY REMANDED to the Secretary pursuant to 42

20

1   U.S.C. § 405(g) for further proceedings consistent with this decision.  The Clerk of Court IS

2   DIRECTED TO enter judgment in favor of Plaintiff.

3   IT IS SO ORDERED.

4   Dated:   **March 26, 2010**                                        _____/s/ Jennifer L. Thurston_____
                                                                              UNITED STATES MAGISTRATE JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28